# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 74 C 3268 and 75 C 3295 | **DATE** | 12/21/2000 |
| **CASE TITLE** | Alliance to End Repression, et al. v. City of Chicago, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. After a bench trial, the court determines that CounterMedia, Active Resistance Organizing Committee, Autonomous Zone, and the *Alliance* named plaintiffs have failed to establish by clear and convincing evidence that the consent decree was violated by police misconduct during the 1996 Democratic National Convention. Judgment is entered for the City of Chicago on all claims. Original Memorandum Opinion and Order is filed in Case No. 74 C 3268.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

courtroom deputy's initials

number of notices

DEC 2 2 2000
date docketed

15
docketing deputy initials

date mailed notice

mailing deputy initials

ED-7
FILED FOR DOCKETING

00 DEC 22 AM 7: 38

Date/time received in central Clerk's Office

Document Number

3315



ALLIANCE TO END REPRESSION, et al.,    )
    )
    Plaintiffs,    )
    )    No. 74 C 3268
    v.    )    75 C 3295
    )
CITY OF CHICAGO, et al.,    )    Judge Joan B. Gottschall
    )
    Defendants.    )

## MEMORANDUM OPINION AND ORDER

### Background

The court conducted a four-day bench trial regarding several of the claims raised in an enforcement petition filed by plaintiffs CounterMedia, Active Resistance Organizing Committee, Autonomous Zone, and the *Alliance* named plaintiffs. The petition was filed under a consent decree entered into nearly twenty years ago by the City of Chicago, the ACLU, and the *Alliance* plaintiffs. The consent decree stems from two prior class action suits in which a number of organizations claimed that the City and its agents violated their First Amendment rights through various investigative practices. The consent decree provides extensive regulations intended to govern the City's investigation of First Amendment conduct by organizations and individuals in Chicago. It also prohibits harassment of, disruption of, or interference with persons because of their First Amendment conduct.

In the enforcement petition, plaintiffs claim that the City, through the Chicago Police Department, committed various violations of the consent decree during and around the time of the Democratic National Convention (DNC) in Chicago in August 1996. Plaintiffs were involved in various political demonstrations, workshops, and rallies around the time of the DNC.

3315

The Autonomous Zone is a collective, community activist center located in Chicago. CounterMedia is a coalition of media groups, political organizations and individuals which provided coverage of the DNC. Active Resistance Organizing Committee is a coalition of activists and organizations which organized the Active Resistance CounterConvention. The CounterConvention took place in Chicago in August 1996, partially overlapping with the DNC. Approximately 700 participants attended. The CounterConvention's two principal locations – the "Ballroom" and the "Spice Factory" – were both located within one mile of the United Center, where the DNC took place.

The court previously ruled that the City was entitled to summary judgment on the majority of claims raised in the petition. *See Alliance to End Repression v. City of Chicago*, No. 74 C 3268, 2000 WL 562480 (N.D. Ill. May 8, 2000). The only allegations that survived summary judgment and proceeded to trial concern: 1) a police raid on the Ballroom; 2) improper police interrogations of Kristian Williams, Julia Moon-Sparrow, and Carla West; 3) the destruction of Stephane Luchini's film during a police search of the CounterMedia van; 4) the destruction of Lee Wells' film while he was held at the police station; 5) the ransacking by police of a van belonging to the Shundahai Network. A more detailed discussion of these allegations is set forth in the court's summary judgment ruling.

### Analysis

In its summary judgment ruling, this court determined that – in keeping with binding Seventh Circuit precedent – plaintiffs must prove violations of the consent decree by clear and convincing evidence. *Id.* at *5. This poses a significant hurdle which must be overcome:

Clear and convincing evidence has been various[ly] defined as: evidence which

leaves the "mind well satisfied that the allegations are true" . . . evidence which "strike[s] all minds alike as being unquestionable" . . . evidence which "lead[s] to but one conclusion" . . . "more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense" . . . proof which leaves no reasonable doubt in the mind of the trier of fact.

*Taylor v. Midwestern Distribution, Inc.*, No. 88 C 5045, 1993 WL 243182, at *8 (N.D. Ill. Jun. 30, 1993) (citations omitted). Although plaintiffs made a credible showing in supporting their allegations with eyewitness testimony, the evidence ultimately falls short of the "clear and convincing" standard on which this court must base any finding of a consent decree violation. The court will address each category of alleged violation in turn.

## The Raid on the Ballroom

According to plaintiffs' witnesses, during the evening of Thursday, August 29, 1996 – the last night of the DNC – between five and twelve police officers entered the Ballroom from the rear of the building. The officers forced those who were outside the building to sit down on the ground, then searched the Ballroom. One officer picked up a file folder and – without looking at its contents – proclaimed the documents "subversive to the government of the United States." (Trial Tr. at 57) The officers pepper-sprayed two individuals – one when they arrived (Lynn Harrington) and one who tried to follow them as they left (Alexander Sakulich). When the officers left, they took with them a cell phone, a radio, a boom box, and the folder of papers, all of which belonged to CounterConvention participants.

The court agrees with plaintiffs' framing of the inquiry into the Ballroom raid as "not whether it happened, but rather the organizational identify of the raiders." (Pls.' Closing at 4) For the most part, the court found the eyewitnesses to the raid to be credible and entirely reasonable in their recitation of what happened on the night in question. However, while that

3

testimony does establish that some sort of raid took place, it is not clear and convincing evidence that members of the Chicago Police Department were responsible for it.

The City seeks to cast doubt on the credibility of plaintiffs' witnesses by asking the court to recognize that they "shared a common, overriding trait: a deep-seeded distrust and resentment for the Chicago Police Department." (City's Closing at 3) Part of this mindset, according to the City, is reflected in the CounterConvention's very nature. It was a "conference of radicals," and was "aimed at a wide range of antiauthoritarian activities." (*Id.*) The City contends that the evidence shows that plaintiffs' witnesses "had an overwhelming, irrational distrust – indeed paranoia – about the Chicago Police Department." (*Id.*) The City argues that this paranoia expressed itself in several ways, including the belief of CounterConvention participants that the police activity in the area was focused on their activities, rather than the nearby DNC, and their expectation of a police raid even before the raid actually occurred.

The court believes that the City's portrayal of the witnesses' bias is, for the most part, overstated. Certainly the CounterConvention attracted participants whose political beliefs are not within the mainstream, and whose chosen forms of public advocacy may bring them into confrontation with the police from time to time. Given their anti-authoritarian leanings, it might even be true that plaintiffs' witnesses harbored a certain degree of suspicion toward the Chicago police before the CounterConvention began. Nevertheless, to the extent that the City contends that the presumed predisposition of plaintiffs' witnesses warrants some sort of discount to the credibility of their testimony, the City goes too far. The court assigns credibility to a witness's testimony based on first-hand observation of the witness on the stand and an evaluation of the testimony's substance in the context of the evidence as a whole.

4

In this case, there is no indication that CounterConvention participants fabricated their testimony about the raid – if they had, they presumably would have ironed out the ambiguities and uncertainties that hinder plaintiffs' effort to establish the CPD's liability. Judging from the witnesses' appearance, demeanor, and matter-of-fact narration of the raid, the court believes that they generally were telling the truth. That said, the substance of the testimony is not sufficient to clear plaintiffs' evidentiary hurdle.

Plaintiffs point out that six eyewitnesses "all testified that they recognized the raiders as Chicago police officers." (Pls.' Closing at 4-5) Four testified at trial, and two others during their depositions. Plaintiffs make much of the fact that the witnesses had lived in Chicago for some time, highlighting that one had lived in Chicago for 11 years and another for 13 years. Presumably plaintiffs believe that this renders them well-qualified to opine on the appearance of Chicago police officers. While the court places great emphasis on the witnesses' substantive observations the night of the raid, the witnesses' conclusory statements as to the raiders' identity are less helpful.

In a limited sense, the possibility of bias raised by the City may be relevant to this conclusory aspect of the witnesses' testimony. While the court does not believe that any of plaintiffs' witnesses fabricated their testimony about what they observed during the raid, the conclusions drawn from what they observed may have been affected by a predisposition to expect police aggression. In that regard, the court focuses on the substance of the witnesses' observations – *i.e.*, the raiders' appearances – rather than the conclusory statements made by the witnesses about those observations: that the raiders were Chicago police officers. If a witness's description of a raider's uniform is inconsistent with CPD uniforms, it matters little if the witness

5

herself concluded that the raider was a Chicago police officer – regardless of how long she had lived in Chicago at the time of the raid.

CounterConvention participant Dan Whitmore testified that he recognized one of the raiders from the Festival of the Oppressed, where the raider was smoking a cigar and talking with higher-ranked police officers. Assistant Deputy Superintendant Thomas Folliard cast doubt on this testimony, claiming that he would not permit officers to smoke while accompanying marches, and Commander Francis Kehoe testified that there is a police department policy against smoking. According to plaintiffs, a videotape of the CounterMedia van's initial search shows a white-shirted police officer smoking a cigarette as he entered the van, and that he did so in the presence of Folliard and Deputy Chief Frank Radke.

The court certainly believes that it is possible that Whitmore saw a police officer smoking a cigar during the Festival of the Oppressed, either because the officer disregarded the police policy or because no such policy exists in any meaningful way. This does not cast doubt on Folliard's expressed displeasure toward the prospect of an officer smoking during a march, but simply shows that his expressed displeasure did not translate into a fully enforced, blanket ban of smoking by officers during marches. In any event, assuming that Whitmore believed that he recognized the cigar-smoking raider as the cigar-smoking officer from the march, his subjective belief is not clear and convincing evidence that they were in fact the same person, especially given his failure to recall seeing CPD patches on the raiders' uniforms and his description of an officer's bulletproof vest that does not match vests approved by the CPD, as well as the shortcomings of the other CounterConvention participants' testimony, discussed below.

Michelle Xenos testified at trial that raiders who remained outside the building identified

6

themselves as Chicago police officers. Xenos did not mention this at her deposition even though she was questioned extensively as to how she knew that the raiders were from the CPD. Her failure to mention such a crucial fact at her deposition gives the court pause in weighing her trial testimony. Xenos did not mention seeing any CPD patches on the officers' uniforms.

Alexander Sakulich did not testify at trial, but during his deposition he stated that the raiders wore "blue shirts with an emblem on both sides, both shoulders." (Sakulich Dep. at 57) He stated that he saw "what looked like Chicago Police Department with the seal on it" on the shoulders of their shirts. (*Id.* at 59) Given that Sakulich did not take the stand at trial, the court did not have the opportunity to evaluate his credibility as a witness. The City argues that Sakulich's willingness to fabricate testimony is shown by his claim to have seen an officer exit the back of the CounterMedia van carrying two strips of film that had been pulled out of a camera. The videotape of the incident showed that the officers carried only a police hat. The court cannot say whether Sakulich lied about that incident – he may have mistaken the black hat for black strips of film, or there may have been another officer that eluded the video camera.

Even so, Sakulich's deposition statements about the raiders' patches are not enough to carry the day for plaintiffs. Sakulich also described in considerable detail the "tonfas" that were carried by the raiders. The City established that CPD officers do not carry such weapons. In light of the other discrepancies discussed below, the court is not prepared to label Sakulich's deposition testimony as "clear and convincing" proof of the raiders' identities.

At trial, Lynda White testified that the raiders' uniforms had Chicago police patches on the sleeves. Two months after the raid, White told Sergeant Joseph Fivelson – who was conducting the CPD's internal investigation of the incident – that none of the raiders' uniforms

7

had badges or name tags, but they did have Chicago Police Department patches, as reflected in Fivelson's report dated October 25, 1996. (City's Exh. 22) At her deposition, however, she was directly asked whether the raiders had patches on their shirts, and she responded that she did not recall. (Trial Tr. at 41) In a previously filed affidavit, she also failed to mention that the raiders' shirts had patches. (*Id.* at 45)

The court must weigh White's testimony regarding the CPD patches against her failure to recall that fact at her deposition, as well as the claims raised in her other testimony. White testified that she was followed by the police on her way to the grocery store before the raid, and that after the raid, she was sufficiently frightened by a police presence outside her home that she climbed up her building's fire escape instead of using the door. Given the huge police presence in the area of the Ballroom on the night of the raid, it is hardly shocking that there was a police car behind White as she drove from the Ballroom to the store. As for her trip home, she could not reasonably have believed that the police presence near her home was targeting her, as she lived along a major thoroughfare leading to the DNC. Certainly White may have been shaken by the events of the evening when she chose to climb up the fire escape, and the court does not mean to belittle her fear, whatever its foundation. However, given the plaintiffs' general lack of supporting evidence other than their witnesses' testimony, the mindset of those witnesses is highly relevant. The court believes that White's behavior suggests that she expected that she would be victimized by the police. Regardless of whether her expectation had a legitimate basis, the court cannot simply accept her testimony regarding the patches at face value, but must consider it within plaintiffs' broader evidentiary showing. Standing alone, White's testimony is not clear and convincing evidence that the CPD carried out the Ballroom raid.

8

Miles Mendenhall testified at trial that he does not "have any clear memory of whether they had patches or not." (*Id.* at 93) According to Sergeant Fivelson's report of his conversation with Mendenhall, Mendenhall told him "that the officers who responded had removed stars, name plates and even patches from their blue shirts. He stated that he was looking for the patches as a way of identifying them and noticed that all of them were removed." (City's Exh. 24 at 6) Plaintiffs argue that Mendenhall's testimony was misinterpreted by Fivelson. Because "CPD patches do not identify subjects," plaintiffs insist that Fivelson misunderstood Mendenhall, who in reality had "been referring to name tags and badge numbers, not CPD patches." (Pls.' Closing at 5 n.1) Plaintiffs refer to no record support for the argument that Mendenhall was referring to name tags and badge numbers, but not patches.

Mendenhall's failure to see patches – and other witnesses' failure to remember whether patches were on the uniforms or not – is damaging to plaintiffs' case. It is highly unlikely that uniformed CPD officers would not be wearing patches on their sleeves. As Officer Mike Jetel demonstrated to the court, the patches are sewn onto the sleeves of officers' shirts, and can be removed only by being ripped off the sleeve, which would deface the fabric.

There are other inconsistencies between the witnesses' descriptions of the raiders and the actual appearance of a uniformed CPD officer:

- Xenos testified at her deposition that the raiders' uniforms were "dark and solid color." (Trial Tr. at 154) At trial, by contrast, she stated that her memory was refreshed by recently seeing Chicago police officers again, and that she would not characterize their shirts as dark. She also admitted that she did not get a good look at the raiders. At best, Xenos is uncertain as to what she saw on the night of

the raid. At worst, her attempt at trial to revise her deposition testimony suggests a desire to make her description of the uniforms fit a preconceived conclusion as to the raiders' identity. Either way, she does not help plaintiffs link the raid to the CPD.

- White testified at trial that she saw a dark seam on the raiders' pants, when at her deposition she stated that the pants had a stripe. Either way, the description is inconsistent with CPD pants, which have no stripe or dark seam.

- Sakulich testified that several of the raiders were carrying "tonfas," which are martial art batons with handles on their sides. In fact, CPD officers do not carry such weapons; the batons they carry do not have any side-handles.

- On the night of the raid, Lynn Harrington told medical personnel that she had been pepper-sprayed by plain-clothes police. (Pls.' Exh. 4) The other witnesses' testimony is explicit that the raiders were wearing police uniforms.

- Whitmore testified that one of the raiders wore a dark blue or black bulletproof vest. The CPD dress code requires bulletproof vests to match the color of the officers' shirt – *i.e.*, light blue or white.

In its summary judgment ruling, the court allowed this claim to proceed to trial notwithstanding the conflicting descriptions of the raiders' appearances. The court reasoned that under the stress and excitement of a police raid, it would be understandable for the details of witnesses' observations to diverge to some extent. After hearing the evidence at trial, however, these inconsistencies have become more problematic to the extent that they differ not only from other witnesses' descriptions, but also from the actual appearance of CPD uniforms. Moreover,

10

the problem of reconciling inconsistencies on the plaintiffs' side, in the face of their high evidentiary burden, is exacerbated by the fact that the court finds the testimony of CPD supervisors and officers in the area that night to be extremely credible.

In order to accept the CounterConvention participants' version of the story, the court would have to believe that a group of CPD officers left their assigned posts, ripped off their CPD patches, removed their stars and badges, obtained non-CPD weapons and at least one non-CPD bulletproof vest, then walked along railroad tracks to carry out a senseless and blatantly unlawful raid on a peaceful political gathering. Alternatively, the court would have to accept the broad contours of the story – that a group of uniformed officers carried out the raid – while disregarding those aspects of the eyewitnesses' descriptions which suggest that the raiders could not have been affiliated with the CPD. Either way, the court does not confront proof that "strike[s] all minds alike as being unquestionable." *Taylor*, 1993 WL 243182, at *8 (citation omitted).

Plaintiffs also offer what they consider to be circumstantial evidence of the raiders' identities. White testified that she was followed by Chicago police officers before the raid as she drove to the store and after the raid as she drove home. The court addressed these allegations in its summary judgment ruling and found them lacking, given that White was driving in an area with a huge DNC-related police presence. *See Alliance to End Repression*, 2000 WL 562480, at *16. For the same reason, the court is not persuaded that White's allegations warrant the conclusion that Chicago police officers were responsible for the Ballroom raid.

White also told Fivelson that the raiders carried canisters that looked like small fire extinguishers. Plaintiffs submitted evidence that during the DNC, the CPD distributed 200 small

11

gas canisters to officers. At most, this evidence shows that White's statement to Fivelson was consistent with the raiders being CPD officers. Certainly not all CPD officers carried such canisters during the DNC, nor is there any indication that such canisters are carried only by CPD officers. This is indeed circumstantial evidence of the raiders' identity, but it is not especially probative, much less clear and convincing.

Plaintiffs repeatedly highlight the "massive numbers of Chicago police officers [who] were in the vicinity of the Ballroom during the raid." (Pls.' Closing at 6) Deputy Chief Radke testified that on the night of the raid, he directed police to wait within a staging area made up of boundaries one block north, one block south, four blocks east, and four blocks west of the Ballroom. Assistant Deputy Superintendant Folliard testified that four or five platoons were stationed there, with 38 officers per platoon. Thus, 152 to 190 police officers were at a staging area that had the Ballroom "at its very center." (*Id.* at 7)

Plaintiffs claim that the CPD's "purported reason for being in the vicinity of the Ballroom on the evening of August 29, 1996 is suspect." (*Id.*) Plaintiffs dispute the CPD's claim that officers were stationed there in case they were needed at the United Center, arguing that other designated staging areas were closer to the United Center. Plaintiffs overlook the evidence that other platoons of officers were already stationed at those other staging areas. The platoons that were moved to the vicinity of the Ballroom had been stationed at other areas in the City, but by Thursday night, there were no events requiring a large police presence other than at the United Center. Deputy Chief Radke testified that the vicinity of the Ballroom was chosen because, as primarily an industrial area, officers could be kept out of public view but still be close enough to the United Center to respond quickly if needed. The court finds nothing suspect about the CPD's

strategic decision to move officers to the area around the Ballroom on the night of the raid.

Suspect or not, plaintiffs argue that the presence of a large number of Chicago police officers near the Ballroom is significant for two reasons: first, "it makes it extremely unlikely that any other group is guilty of the raid," and second, "it puts a large number of Chicago police officers at the scene of the crime at the time of the crime and thus, in itself, makes them suspects." (*Id.* at 8)

The court agrees that the large police presence in the area makes it less likely that a non-CPD group could have carried out the raid undetected. It does not, however, make it impossible. The fact that the raiders came and left via the railroad tracks behind the Ballroom, rather than entering from the street through the front door, could have allowed the raiders to conduct their mission without encountering any CPD officers. Commander Kehoe testified that his officers were waiting in their vans one and one-half blocks from the Ballroom; it is not as if they had established a security perimeter around the Ballroom itself. In any event, plaintiffs' burden is to show by clear and convincing evidence that the City is responsible for the raid, not simply that other groups are less likely to have pulled it off successfully.

The court also agrees that the CPD's presence in the area makes it a possible source of the raiders; this was one factor underlying the court's decision to allow the claim to proceed to trial. However, the CPD's mere presence in the area is not clear and convincing evidence that the CPD is responsible for the raid. In fact, it makes it less likely that the raid could have occurred without any of the CPD supervisors in the area being aware of it. Commander Kehoe testified that the officers were under direct orders to stay with the police vans so that they could be dispatched at a moment's notice. For five to twelve officers to wander away from the vans to

13

conduct an unauthorized raid surely would have attracted someone's attention. There is no

evidence that any CPD officers or supervisors who were in the area of the Ballroom that night

were aware of any wayward officers. While it is conceivable that the City's witnesses are lying,

the court finds no reason to believe that such is the case. Nor does it find anything in the record

that would support a finding of a widespread CPD cover-up.

Plaintiffs attempt to cast suspicion through their witnesses' testimony that after the raid

on the Ballroom, the CPD vehicles parked near the Ballroom were no longer there, and that the

police massed near the CounterConvention's other facility, the Spice Factory. The police were

not required to remain at the staging area for the entire night. As soon as the DNC's activities

ended at the United Center, they were released to go home. The court does not know if or why

they would gather near the Spice Factory, but there is no evidence that any raid occurred there.

More broadly, this evidence supports the theory that the entire force of police massed near the

Ballroom was somehow involved – or at least complicit – in the raid. Absent a cover-up of

staggering proportion, it is not possible that there would be no evidentiary trace within the CPD

of such a large and widely known operation.

According to plaintiffs, no other police group could have carried out the raid. As for the

Chicago Housing Authority police, plaintiffs ask the court to take judicial notice of a newspaper

article describing that police force as largely African-American. The court declines to take

judicial notice of the racial composition of the CHA police on the basis of a conclusory statement

in a newspaper article that was never entered into evidence. That said, the court finds it highly

improbable that the CHA police were responsible for the raid. The Ballroom is not on CHA

property, nor has the City pointed to any conceivable motivation for the CHA police to leave

14

their jurisdiction and randomly raid a political convention.

The City focuses on the Union Pacific Railroad police as the most likely source of the raiders, given the Ballroom's proximity to railroad tracks and the similarity between the UP and CPD uniforms. Union Pacific Police Regional Manager Dale Hahne testified that the UP police force consisted of between 20 and 25 officers at the time of the DNC, but that all but three officers were assigned to drive corporate executives or provide protection at various functions hosted by Union Pacific during the DNC. The City points out that Hahne did not specify where each of his officers was on the night of the raid. Hahne's testimony establishes that the UP police uniforms are similar to the CPD uniforms, but that only officers stationed in the Chicago passenger terminal are required to wear the uniform. He also stated that the officers do not carry tear gas canisters.

The testimony of the CounterConvention participants suggests that the raid had some connection with the railroad tracks behind the Ballroom. Mendenhall testified that the raiders told him they "had a call from the railroad company complaining about people being on the tracks, and that's why we have come." (Trial Tr. at 90) Whitmore testified that one of the raiders told him that "we had illegally entered the building from railroad property, and that they were – so they had come in pursuit of us." (*Id.* at 55) Xenos testified that the raiders "said that they were there investigating somebody who had allegedly hopped a freight train or hopped a train from that location." (*Id.* at 146) Sakulich testified that when he attempted to follow the raiders as they left the Ballroom, they told him that he was trespassing on railroad property. While the court is by no means convinced that the UP police carried out the raid, the court must acknowledge that it is possible for them to have done so. That alone poses a formidable obstacle

15

to plaintiffs' ability to satisfy their evidentiary burden.

While the City relies on the above testimony of Whitmore, Mendenhall, Xenos and Sakulich to conclude that the UP police carried out the raid, plaintiffs rely on the same testimony to conclude that the CPD was responsible. Plaintiffs' theory finds support in Hahne's testimony, who stated that he called the CPD's 13th District on the day before the raid after some children told him that a group of people camping near the railroad tracks had a van with a sign that said something like "Kill the President." Hahne did not indicate what he specifically told the 13th District personnel. The City contends that there is no evidence that such a call was received or subsequently investigated.

Even assuming that Hahne did report a possible trespass to the CPD, it requires a leap in logic to conclude that Hahne's call sparked the Ballroom raid. If Hahne told the CPD about a sign threatening the President, who happened to be coming into town, presumably the CPD would not wait until the following night, after the President's arrival, to investigate. If Hahne simply reported a potential trespass by campers, the CPD presumably would send only an officer or two to investigate, especially during a labor-intensive event such as the DNC. It would make no sense for the CPD to respond to such a call by committing five to twelve officers to launch an all-out raid of the building at the site of the alleged trespass, pepper-spraying those outside the building, and stealing personal belongings of the building's occupants. Whether Hahne reported the threatening sign and/or the trespass, there would be no reason for the CPD to enter and exit through the rear of the Ballroom, walking along railroad tracks, instead of driving their vehicles to the Ballroom's front door. If the CPD acted on Hahne's call, it would have been a legitimate police investigation; plaintiffs' allegations suggest anything but a legitimate police investigation.

16

Further, if the CPD action was carried out pursuant to Hahne's phone call, there would be some trace of the action within the CPD. For there to be no documentary record of such an operation would require a cover-up of considerable scope and brashness. Absent some type of supporting evidence, the court cannot presume a cover-up based simply on the fact that the CPD has no record of the event in question. To do so would force the City to prove a negative – *i.e.*, proving that the lack of documentary evidence of the raid stems from the fact that the CPD did not conduct such a raid, not from a subsequent cover-up. The consent decree does not warrant such a burden. While the court agrees the CPD's internal investigation of the raid was far from satisfactory, it evidences, at most, a lack of diligence by Fivelson, not a broader or more nefarious scheme by the CPD.

Plaintiffs also purport to find a motive for the raid in the CPD's "long history of spying upon and harassing liberals and radicals." (Pls.' Closing at 9) But there is no foundation in this record for implying guilt based on the CPD's past misdeeds. On the contrary, the court was impressed at trial with the CPD hierarchy's awareness of the consent decree, as well as a noticeable concern for its requirements. Based on the City's witnesses at trial, the court has seen nothing to suggest that the CPD – ranging from the upper echelons of the Department down to the patrol officers – has given short shrift to their obligations under the consent decree. The CPD appears to have made a significant effort to distance itself from the infamous "Red Squad" days, both in mindset and in practice.

But plaintiffs' case faces another obstacle. Even if the court were convinced that the perpetrators were members of the CPD, it is skeptical that a finding of contempt would be appropriate. It is true that a court "ordinarily does not have to find that the violation [of a court

17

order] was 'willful' to find a party in contempt," and that the party may be in contempt "if he has not been 'reasonably diligent and energetic in attempting to accomplish what was ordered.'" *Stotler and Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir. 1989) (citations omitted). However, the evidence before the court shows that the CPD went to great lengths during the DNC to ensure that its officers honored the First Amendment rights of demonstrators. Whether this was motivated by a desire to comply with the consent decree or a desire to avoid scandalous behavior before the world's television cameras is not important to the court's present inquiry.

On this record, even if the court were to find that plaintiffs met their burden to show that CPD officers committed the Ballroom raid, it would be inclined to conclude that a rogue band of officers carried out the raid, contrary to their training and without direction from their superiors. While the officers responsible undoubtedly would deserve punishment, the court is not convinced that the CPD itself should be held in contempt of the consent decree for its failure to anticipate and prevent an isolated lawless action. In any event, such a determination is unnecessary, as plaintiffs have failed to establish by clear and convincing evidence that the Ballroom raid was carried out by officers from the CPD.

*Improper Interrogations*

While Carla West, Kristian Williams, and Julia Moon-Sparrow were in police custody, plaintiffs claim that officers asked them questions that are prohibited by the consent decree. The interrogations allegedly included questions pertaining to the arrestees' political beliefs and previous political activities. Carla West testified that three accompanying police officers interrogated her for the duration of her 45-minute to one-hour transport from the police station to a women's lockup. Two of the transporting officers testified at trial that neither they nor the

18

other officer, Sergeant John Blake, asked West any questions related to political activities or opinions. They claimed that they had no conversation with her whatsoever. For plaintiffs, the prospect "[t]hat three male Chicago police officers would be virtually silent with their female college student arrestee is difficult to believe." (Pls.' Closing at 12)

The City challenges West's recollection that the trip took 45 minutes, arguing that the arrest report shows that she was received in the women's lockup just 20 minutes after Neil Corcoran – her friend with whom she was arrested – was received in the lockup at the police station where both were initially taken. The court does not find this discrepancy to be of much significance. The City presumes that Corcoran was "received" at the police station's lockup at the same time West began the ride to the women's lockup, and that West underwent no other processing or delays between the time she physically arrived at the women's lockup and the time she was "received." The court has no evidence that those presumptions are valid.

That said, plaintiffs have not presented clear and convincing evidence that the alleged political interrogations took place. While the court finds that West was a reasonably credible, if bashful, witness, her testimony is directly refuted by the testimony of two equally credible police officers. In this regard, the court acknowledges the difficulty plaintiffs have in meeting their burden of proof given that there were no impartial eyewitnesses to the interrogation, but only the target of the questioning and the questioners themselves. The difficulty is compounded where, as here, both sides are believable in stating their version of the disputed event. Under such circumstances, it is nearly impossible for plaintiffs to convince the court to the level of clear and convincing evidence that West should be believed over the transporting officers. Nevertheless, that is what they must do in order to satisfy their burden. They have not done so, and thus the

claim fails.

Moon-Sparrow and Williams testified that they were asked political questions after they were arrested during the stop of the Shundahai Network van. Both claim to have been asked objectionable questions by several different officers while they were held at the 14th District police station. The officers who testified denied asking them any political questions or hearing any other officers ask them any political questions. Williams appeared credible on the stand, but his actions during the stop of the van suggest a significant hostility toward the police. Sergeant James Spratte testified that Williams locked the van's door and attempted to roll up the window when police attempted to gain entry, and that Williams subsequently kicked Spratte as he entered the van.[1]

Moon-Sparrow's testimony also reflected a potential bias against the police. At her deposition, she stated that all of the African-American women held in the lock-up with her were innocent of the charges against them and had been arrested simply because of their race. At trial, she acknowledged that she had no firsthand knowledge of the circumstances leading to her cell-mates' arrests. Without a doubt, Moon-Sparrow is entitled to her opinion. But given the closeness of this evidentiary dispute, the fact that she would make such a baseless statement about a collateral aspect of her time in custody calls her objectivity into question. Absent some type of supporting evidence, her testimony is not sufficient to overcome the officers' testimony that directly and credibly rebuts her allegations. The court does not have before it clear and

---

[1] The kicking evidence was disputed; there was evidence that Williams had a seriously injured foot and could not have kicked Spratte. The court can find nothing in the record, however, disputing the testimony that Williams tried to prevent the officers' entry by locking the door and rolling up the window.

convincing evidence that Moon-Sparrow was the victim of improper interrogation.

The court acknowledges that the officers may also have had their own biases and, if they did what they are accused of doing, their motive to fabricate would be substantial. But a swearing contest between apparently credible witnesses on both sides presents a fatal problem when plaintiffs must carry a clear and convincing burden.

## *Destruction of Film*

Lee Wells testified that a "large white officer" pulled the film out of Wells' camera while he was being processed by an African-American officer at the police station. At his deposition, he stated only that the officer opened up his camera. Wells' testimony was supported by his fellow arrestee, James McGuinness, who testified at trial that a police officer was pulling the film out of a few cameras. At his deposition, McGuinness stated only that the officer kept opening up the backs of cameras.

Both witnesses' testimony was effectively rebutted by Officer Ray Dexter, the officer who processed Wells. Dexter testified that Wells' camera remained in Dexter's possession during the entire time of Wells' processing. He testified that, pursuant to usual police practice, he probably opened up the camera to check for contraband, but he did not pull out the film. He also stated that no one else tampered with Wells' camera while it was in Dexter's possession, and that he sealed the camera into an envelope or bag after it was inventoried. The court noted Dexter's straightforward manner and found him to be a credible witness. While McGuinness also appeared credible on the stand, Wells had some difficulty getting some aspects of his testimony straight, as discussed below. Further, the court notes that neither Wells nor McGuinness testified at their deposition that an officer pulled out Wells' film. Under these

circumstances, their testimony is not clear and convincing proof that officers pulled film out of Wells' camera.

Matthew Ferreira and Moon-Sparrow also testified that they saw police officers pull film out of cameras at the police station, but their testimony does not pertain specifically to Wells' camera, and so is not sufficient to overcome Dexter's testimony. The claim at issue is whether Wells' film was destroyed by police, not whether police pulled any film out of cameras during the time Ferreira and Moon-Sparrow were in custody. Under these circumstances, the court cannot find that plaintiffs have proved the destruction of Wells' film by clear and convincing evidence.

The testimony regarding the destruction of Stephane Luchini's film is not consistent. At his deposition, Wells stated that he was pulled from the CounterMedia van, the officers then entered the back of the van, and he saw them open Luchini's camera. Perhaps realizing that it would be difficult to see into the back of the windowless van, he modified his testimony to state that he was pulled out of the van after the police opened the camera, or that it all occurred at the same time.

Wells' version of events finds little support in the other witnesses' testimony. According to Luchini's deposition testimony, Jim Bell told him that an officer outside the van exposed Luchini's film by opening up the camera, then closing it. Luchini himself did not see any officer open his camera, either inside or outside the van. Edmund Nix, who was seated next to Wells inside the van, did not see any officer open a camera, nor did Robert Boyle, who was at the scene taking photos. Sakulich testified that he saw an officer carrying strips of film as they exited the van. Four officers who were involved in the search testified credibly that they did not open up

22

any cameras. The videotape of the incident shows two officers exiting the back of the van, but the only item either one is carrying is a police hat. Plaintiffs claim that the film destruction was not videotaped by bystanders because it occurred inside the closed back of the van. While it is entirely possible that certain police acts escaped the camera operator's attention, a finding for plaintiffs would require the court to engage in sheer speculation based on highly conflicting testimony.

Plaintiffs do not spend much time attempting to bolster their evidentiary showing related to the claims of film destruction at issue here, but instead rely on the videotape of the CounterMedia van searches to suggest that police testimony regarding the searches reflected a police "code of silence." (*Id.* at 1) First, plaintiffs challenge the testimony of Folliard and Sergeant Richard Grand, who claimed that one reason the van was initially searched was because it was in the path of a protest march. According to plaintiffs, "[t]he video shows that the CounterMedia van had stopped behind another vehicle at an intersection and was not blocking the march." (*Id.* at 2) Whether the van was directly in the march's path or was simply bordering that path, its proximity to the march, coupled with its visible safety hazards, gave police ample justification for investigating.

Second, plaintiffs challenge Folliard's testimony that the van's occupants claimed that they could not move the van because they did not have the keys. Plaintiffs argue that the video shows that as police approached, the driver was attempting to start the van. Whether the driver was attempting to start the van is not as clear to the court as it is to plaintiffs. Further, whether the driver had the keys is not essential to the propriety of the police action or the credibility of Folliard's testimony. Even if the driver could not move the van because it would not start, the

23

police were legitimately concerned. Folliard may well have been wrong on that minor detail. He would have no reason or motive to fabricate that aspect of his testimony, as the police action was reasonable under either factual alternative. The court found his demeanor and the substance of his testimony to be credible.

Third, while officers testified that they were concerned about potential dangers posed by a rag hanging out of the van's gas tank and a gas can on the van's floor, plaintiffs contend that the video shows no statements by police reflecting such concerns. Further, plaintiffs argue that the video shows an officer smoking a cigarette, which would be inconsistent with such concerns. The police were not required to identify the nature of the safety hazard when they initially approached the van, especially given that their primary concern was to move the van away from the march as quickly as possible. If an officer did in fact smoke a cigarette near the van, that was, at most, a foolish thing for that officer to do. It does not mean that the police made up the testimony about the rag and the gas can.

Fourth, plaintiffs insist that the video contradicts Sergeant Grand's testimony that he did not remember seeing any cameras or video equipment in the van, and that he participated in the van's initial stop. Obviously, plaintiffs point out, there must have been a camera in the van given that the videotape was shot from the front seat of the van during the initial stop. In denying knowledge of any cameras in the van, Grand may have been thinking of the police search of the van once the occupants were removed – presumably, the video camera's operator took the camera with him as he exited. Or Grand may simply have forgotten about the video camera held by the front seat passenger. There is no reason to believe, however, that Grand remembered seeing an operating video camera pointed at him, then decided to lie about its existence. Such a

lie would be pointless (given the immateriality of a single video camera's presence in the van), as well as hopeless (given the easy refutation of his lie by the videotape itself). Indeed, Grand himself testified that he had seen the videotape of the initial stop.

More fundamentally, plaintiffs' various challenges to officers' testimony based on the videotape of the first CounterMedia van stop do little to help their cause. The first stop is no longer at issue in this case, and the second stop is relevant only to the alleged film destruction. The officers' testimony regarding the search is not so questionable that it casts doubt on their testimony regarding the claims that are at issue.

*Ransacking of Shundahai Network Van*

Matthew Ferreira testified that when he retrieved the Shundahai Network van from the auto pound yard after he was released from jail, the interior of the van appeared to have been ransacked. The CB radio was smashed, a video camera was broken, and water had been poured on the van's contents. Moon-Sparrow saw the van that same day, and she also testified that the CB radio was smashed, the video camera broken, water and mud had been smeared around, boxes of t-shirts had been dumped out and dirtied, and personal belongings had been ripped up. The City insists that nothing was stolen from the van, and if what plaintiffs claim happened occurred, it was simply an act of senseless vandalism.

Plaintiffs attempt to link the vandalism with the police through the testimony of Moon-Sparrow, who recalled seeing items thrown from the van as she walked to the squadrol after being arrested. She testified that she was the last person to get into the squadrol, but Melissa Rohs testified that, although she was not certain, she believes that she, not Moon-Sparrow, was the last person into the squadrol. No one besides Moon-Sparrow testified to seeing anything

thrown from the van. As noted above, the court is concerned that Moon-Sparrow's observations were colored by her apparent disdain for the Chicago police. Moreover, the CPD officers involved in the stop of the Shundahai Network van and the arrest of its occupants testified that no one searched the van's interior, much less destroyed its contents. Officers Michael Bocardo and Joseph Perez testified that they drove the van to the pound, parked it in front of the pound's gate, and turned the van over to the pound's employees.

The testimony of Bocardo and Perez is not challenged directly by plaintiffs, who concentrate their firepower on the credibility of Sergeant Spratte. Plaintiffs apparently believe that by casting doubt on Spratte's narration of the Shundahai Network arrests, the court will be more convinced that the CPD is responsible for ransacking the van's interior. First, they take issue with Spratte's statement that Kristian Williams kicked him hard with his injured left foot. According to plaintiffs, "[a] severely injured civilian is unlikely to kick a linebacker-s[i]zed police officer, particularly using the injured limb," and Williams does not "appear to be the street-fighting type." (*Id.* at 11) Second, plaintiffs contend that Spratte lied when he testified that he was unable to observe that Williams was injured at the time of the arrest because "Williams' shoe was off, and the bare foot had a bag of ice on it." (*Id.*) Third, plaintiffs challenge Spratte's testimony that there were no video cameras at the 14th District police station. In reality, plaintiffs contend, video cameras belonging to the Shundahai Network, Carla West, and Jeff Perlstein were at the 14th District. Fourth, plaintiffs argue that Spratte contradicted the testimony of plaintiffs' witnesses when he stated that he did not see a CB radio, video camera, literature, books or tapes in the Shundahai Network van.

In a situation where officers' efforts to enter a vehicle are resisted, some confusion as to

26

what happened and who did what to whom is to be expected. The purported discrepancies in Spratte's testimony reflect this confusion. The court has seen nothing to suggest that Spratte perjured himself when recounting the events leading up to the arrest of Williams. Whether or not Spratte remembers seeing video cameras at the police station or the van's contents is not a basis for concluding that Spratte cannot be believed. Even less can it be used to substitute for the lack of any credible evidence suggesting that CPD officers ransacked the van. The fact that police officers temporarily took possession of the van is not clear and convincing evidence that they vandalized it. Employees of the auto pound or intruders in the auto pound could have been responsible. While plaintiffs may have been able to establish that the CPD was negligent in securing their van overnight, they have not offered clear and convincing evidence of a consent decree violation.

### Conclusion

For the above reasons, the court finds that plaintiffs have failed to prove any of their claims against the City by clear and convincing evidence. This ruling should not be interpreted as a finding that plaintiffs' witnesses did not testify truthfully, or that the incidents underlying their claims did not in fact happen. The ruling is simply a recognition that the conflicting but credible evidence on both sides precludes plaintiffs from establishing their claims by clear and convincing evidence. Judgment is entered for the City on all claims.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: December 21, 2000